UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

STEVEN TATE,                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No.:  3:11-CV-87
                                      )                (VARLAN/GUYTON)
SAM'S EAST, INC.,                     )
                                      )
            Defendant.                )

**MEMORANDUM OPINION**

This civil action is before the Court on Defendant Sam's East, Inc.'s Motion for

Summary Judgment [Doc. 15]. Plaintiff filed a response in opposition [Doc. 21], and

defendant replied [Doc. 23]. The Court has carefully considered the matter and for the

reasons stated herein, the Court will grant defendant's motion.

**I.       Background**

Plaintiff presents claims against defendant, a membership-based wholesale club

with over 600 locations selling a wide variety of items, arising out of his employment

with defendant in various positions over a period of several years. As described herein,

plaintiff claims discrimination based on race and disability. Plaintiff also claims that he

was retaliated against and forced to work in a hostile work environment and that he was

forced to work while off the clock. Plaintiff's race discrimination claims arise under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and his

disability discrimination claims arise under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.* Defendant has moved for summary judgment on all of plaintiff's claims.

Plaintiff Steven Tate ("plaintiff") was hired by defendant Sam's East, Inc. ("defendant") on October 23, 1993, to work as a Bakery Associate in Sam's Club #8256 in Knoxville, Tennessee.[1] When plaintiff was hired, he attended Sam's Club orientation, where defendant's safety and other policies were explained to him. Plaintiff signed various documents acknowledging that he had received and read the Sam's Employee Handbook. Plaintiff also takes computer based learning ("CBL") courses at Sam's. There are CBLs on topics such as the Americans with Disabilities Act ("ADA"), Associate Safety, Diversity and Inclusion, Inappropriate Behavior, and Corporate Ethics.

Plaintiff worked as a Bakery Associate until approximately October 1998. Plaintiff was then transferred to Sam's Club #6572, also in Knoxville, when it opened, and he has worked in various positions there. In 2003, plaintiff sustained an injury to his left arm in a non-work related incident at home and was required to take an approximately three-month medical leave of absence for shoulder surgery. When plaintiff returned from medical leave in spring 2004, plaintiff presented defendant with a doctor's note from his personal physician, Dr. Brian Holloway, placing him on a lifting restriction of no more than twenty to twenty-five pounds with no repetitive lifting. After returning with restrictions and having a Request for Reasonable Accommodation

---

[1] Both plaintiff and his wife, Mary Tate, are current employees of defendant. Plaintiff currently works as a Maintenance Associate, making approximately $16.25 per hour.

2

approved, plaintiff moved to the position of People Greeter.  He remained in that position for approximately four years.

In 2007, plaintiff wanted to move from the People Greeter position to a position as a Tire Mounting Area ("TMA") Cashier.  The TMA Cashier position required "frequently lifting and sorting merchandise and supplies up to 30 pounds without assistance and over 30 pounds with team lifting" [Doc. 17-16].  On March 29, 2007, plaintiff completed a second Request for Reasonable Accommodation form, requesting an accommodation for the TMA Cashier position lifting requirement.  Plaintiff and defendant's Accommodation Service Center then went through the process of plaintiff filing two appeals and defendant concluding that plaintiff's request was unreasonable because it essentially eliminated the TMA Cashier position's requirement of lifting thirty pounds.  Several months later, plaintiff provided a new doctor's note to defendant, with a new lifting restriction of no more than thirty pounds.  On October 13, 2007, after receiving the new note, defendant transferred plaintiff to the TMA Cashier position.

In February 2009, the Market team, comprised of Sam's Club Managers, the Market Human Resources Manager, and the Market Manager for the geographical territory, met to evaluate staffing levels and sales performance.[2]  The Market team decided to eliminate the TMA Cashier position throughout the Market, as the team concluded that the Tire Technicians could absorb the job responsibilities of the TMA

_____

[2] The Market referenced here is comprised of the Sam's Clubs in the State of Tennessee and several cities bordering Tennessee [Doc. 17-19].

Cashier. Only a few Sam's Clubs in the Market had a TMA Cashier position at the time, and plaintiff was the only TMA Cashier at Club #6572 when the position was eliminated. Two meat cutter positions and two maintenance positions were also eliminated at Club #6572 around the same time. The other four eliminated positions were held by Caucasian associates at the time. The two meat cutters, Jordan Bureman and Edward Philips, were offered and accepted positions that were open when their positions were eliminated, in the Produce and Deli Departments, respectively. Both of them had their hourly pay reduced because of the difference in Position Pay Grade ("PPG") from their eliminated position to their new position, with Mr. Bureman and Mr. Philips having reductions in their hourly wages of $1.00 and $.40, respectively.[3] The two Maintenance associates, Leonard Meyer and Knute G. Johnson, were terminated after their positions were eliminated.

Club Manager Byron Johnson met with plaintiff on February 25, 2009, following the elimination of the TMA Cashier position, and offered him the two open positions at the Club location at the time, Produce Associate and a Cashier position. Mr. Johnson also told plaintiff that he could seek employment elsewhere. Plaintiff accepted the Produce Associate position immediately. Plaintiff's Job Offer for the Produce Associate position notes that the PPG for plaintiff's TMA Cashier position was a level 4, with a pay rate at the time of $15.25 per hour, and the PPG for plaintiff's new Produce Associate

---

[3] Defendant assigns each position in a Club a PPG, based upon the job responsibilities of the position. Each step up in PPG provides an associate with a $.20 per hour pay increase [Doc. 17-1].

position was a level 3, with a new pay rate of $15.05 per hour. Plaintiff signed the Produce Associate job description, thereby acknowledging that he had the ability to perform the essential functions of the position, including a fifty pound lifting requirement, with or without accommodation. Plaintiff's Job Offer form indicates that he accepted the offer on February 25, 2009, and the position start date was to be February 28, 2009 [Doc. 17-5, p. 3]. At his deposition, plaintiff testified that he "had no choice" but to select Produce Associate and that he "would have been fired if [he] did not accept work in the area outside of [his] restrictions" [Doc. 21-1, p. 3]. Plaintiff claims that after informing Mr. Johnson that he had a thirty pound weight restriction with no repetitive lifting, Mr. Johnson informed him to "[d]o it anyway" [*Id.*].

On February 28, 2009, plaintiff brought two doctor's notes to Manager James Harrison. One of the notes released plaintiff to return to work and the other note stated that plaintiff had the restrictions of no lifting over thirty pounds and no repetitive lifting. On that same day, when Mr. Harrison and Assistant Manager Beth Denise read the doctor's note containing the work restrictions, plaintiff was informed that he could not work in the Produce Associate position and he was sent home. Plaintiff never worked in the Produce department after February 28, 2009.

On March 3, 2009, plaintiff filled out a Worker's Compensation Request for Medical Care form, indicating that he suffered a shoulder strain lifting produce merchandize on February 23, 2009. The portion of the form filled out by his physician indicates that plaintiff was diagnosed with a left rotator cuff strain and was given

5

restrictions of a maximum lifting limit of five pounds, no overheard reaching, and no above the shoulder work. In a doctor's note following an appointment on March 2, 2009, plaintiff was allowed to return to work on March 16, 2009, with the permanent restriction of lifting twenty-five to thirty pounds with no repetitive lifting.

Defendant then conducted an accident review related to plaintiff's injury, and plaintiff received a written Coaching for Improvement notice for using the unsafe work practice of lifting over thirty pounds or using improper lifting techniques. Plaintiff's pay was not reduced at that time. Plaintiff was then worked in two Temporary Alternative Duty ("T.A.D.") assignments, first as a D.V.D. Monitoring Associate for several weeks beginning on March 6, 2009.[4] Next, on March 22, 2009, plaintiff accepted a job as a Meat Demo Associate and signed the Meat Demo Associate Job Description, with the job to begin on March 28, 2009. As Meat Demo Associate, plaintiff gave out samples of ribs and chicken, and his job was primarily to sell ribs and chicken.

When asked at his deposition if he remembered getting praise from managers with regard to how well he was selling ribs and chicken, plaintiff testified "[t]hey just told me to keep selling ribs. That's what they told me, and the chicken" [Doc. 17-2, p. 22]. Plaintiff was given a red apron to wear that stated "Rotisserie Rib King" on the front by Lead Supervisor Vincent Hall, who is African American. Mr. Hall received the apron from defendant's management; management had received it from a vendor in

---

[4] When associates have worker's compensation claims and have been given work restrictions, defendant assigns them to Temporary Alternative Duty positions. T.A.D. positions are for a limited period of time.

appreciation for Club #6572 being the number one rib-selling Club in the country. Plaintiff believes that wearing the apron was discriminatory on the basis of his race because "[i]t was associated with African American culture" [Doc. 17-2, p. 77]. Other of defendant's employees, including Caucasian associates, have been responsible for selling ribs and chicken.

Plaintiff alleges that defendant's employee Brian Heid told him to "just sell them ribs," and that Mr. Johnson told him he "need[ed] to work with the ribs and chicken," and that Mr. Johnson "want[ed] to see [plaintiff] sweat" [Doc. 22-3, pp. 3-4]. Plaintiff testified that Mr. Hall witnessed Mr. Johnson make the second comment and that Pat Bratton, defendant's former Operational Manager, witnessed the third comment. Plaintiff testified that sweating is associated with African-American culture. Plaintiff testified that he was stereotyped on the basis of his race when he was working in the Meat Demo Associate position and was called "the chicken man" by "[s]omeone from the home office named Michael" [Doc. 22-3, p. 6].

On December 6, 2009, plaintiff accepted a Maintenance Associate position, which requires plaintiff to lift less than or equal to twenty-five pounds. When plaintiff left the position of Meat Demo Associate and moved to Maintenance he received a reduction in pay as his PPG changed from PPG 3 to PPG 2. Plaintiff obtained regular raises throughout his employment with defendant and has received positive reviews. According to Mr. Johnson and Donald Vanek, defendant's Market Human Resources Manager, he has generally performed well.

7

Plaintiff never used defendant's Open Door policy, called Market Managers, or called defendant's anonymous 1-800 Ethics Hotline to complain about discrimination on the basis of his race or disability or about harassment or a hostile work environment. Posters in the break room at Club #6572 provide the names and telephone numbers for the Club Manager and Market Managers, as well as the Sam's 1-800 Ethics Hotline telephone number, and complaint procedures for Harassment/Inappropriate Conduct.

Plaintiff claims that the first discrimination he suffered on the basis of his race was "when [he] was forced to work in the produce area" [Doc. 17-2, p. 23]. The first time plaintiff believes he was discriminated against on the basis of his disability was when he was "forced to work in areas outside of [his] restrictions" [*Id.*]. "Plaintiff believes he was discriminated against based on his race when he was forced to take the produce associate position because he was 'black and [had] a disability'" [Doc. 21-1, p. 4 (citation omitted)]. Plaintiff claims that his assignment to the Meat Demo Associate position was discriminatory on the basis of his race, but not disability [Doc. 22-3, p. 6].

Plaintiff alleges that his Caucasian co-workers were allowed more job assignments than he was and were allowed to work in areas that he was not able to but could have despite his disability. At his deposition, plaintiff testified in general terms that Teresa Loveday was able to work in the clothing area in February or March of 2009, and that Teresa Lanessa was accommodated to work from night shift to day shift after she suffered an injury. Plaintiff testified that while defendant accommodated his lifting restrictions after his injury, moving him to D.V.D. Monitoring, Meat Demo Associate,

8

and then Maintenance, he was treated worse than Ms. Loveday and Ms. Lanessa, who are both Caucasian, because he was required to take a leave of absence following his on-the-job injury, while they were allowed to come back to work without leave. Plaintiff additionally testified that Wayne Rippy, also Caucasian, was able to work as a People Greeter following surgery, and that Mr. Rippy was thus treated more favorably than plaintiff. Plaintiff admitted that he did not know if there was an open People Greeter position when Mr. Rippy was placed in it and he does not remember the time period during which that occurred.

On May 4, 2009, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging defendant discriminated against him on the basis of his race and disability, retaliated against him, and forced him to work in a hostile work environment. Plaintiff received a "right to sue" letter on November 23, 2010.

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d

9

937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

10

### III. Race Discrimination Under Title VII

In Title VII actions, "a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). Defendant asserts that because there is no direct evidence of discriminatory intent in this case, plaintiff's claim should be analyzed under the *McDonnell Douglas* framework; plaintiff does not dispute this. [Doc. 12 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1972)]; [*see* Doc. 21-1]. When using circumstantial evidence to create an inference of discrimination, the burden-shifting framework first announced by the United States Supreme Court in *McDonnell Douglas* applies. Under this framework, a plaintiff carries the initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of discrimination by his or her employer. In order to demonstrate a *prima facie* case, the plaintiff must show: (1) membership in a protected class; (2) that the plaintiff suffered an adverse employment action; (3) that the plaintiff was qualified for the position; and (4) that the plaintiff was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). In reduction in workforce cases where "the most common legitimate reason for the termination is" the reduction itself, "the fourth factor of the *prima facie* burden requires 'additional direct, circumstantial, or statistical evidence

11

tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Nelson v. General Elec. Co.*, 2 F. App'x 425, 430 (6th Cir. 2001) (citations omitted). A plaintiff who successfully establishes a *prima facie* case receives the benefit of a presumption that the employer unlawfully discriminated against the plaintiff. *Texas Dept. of Cmty. Affairs*, 450 U.S. at 254.

The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting M*cDonnell Douglas*, 411 U.S. at 802). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Although the burdens of production shift throughout the *McDonnell Douglas* framework when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*; *see also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

Plaintiff has alleged that defendant discriminated against him based on race with respect to his having been moved to different positions throughout his employment with defendant, some with reduction in pay. For the purposes of establishing plaintiff's *prima facie* case, it is undisputed that plaintiff, an African-American male, is a member of a protected class. *See Wright*, 455 F.3d at 706 (recognizing that an African-American male was a member of a protected class for Title VII purposes). Defendant asserts that

12

plaintiff cannot establish a *prima facie* case of Title VII race discrimination because plaintiff cannot establish the fourth element, that is that he was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of the protected class.

Defendant argues that plaintiff cannot show that he was replaced by someone outside of the protected class when plaintiff was removed from the TMA Cashier position because defendant eliminated the TMA Cashier positions throughout the Market as a whole, and the Tire Technicians took over the position's duties. Plaintiff was the only TMA Cashier at Club #6572 at the time, and defendant did not hire additional TMA Cashiers at any stores in the Market. Accordingly, as plaintiff's position no longer existed, plaintiff was not replaced at all, let alone by someone outside of the protected class.

Defendant also argues that plaintiff has not and cannot prove that any similarly situated persons outside of the protected class were treated move favorably than him. Defendant asserts that within the same time period of the elimination of plaintiff's TMA Cashier position, four other positions in two additional departments, all held by Caucasian associates, were eliminated. Two of the associates were offered and accepted alternative positions at lower PPGs in the Produce and Deli departments, and each of those associates received a greater pay reduction than plaintiff did when he moved to the Produce Associate position. The other two Caucasian associates whose positions were

13

eliminated, who both worked in the Maintenance department, had their employment terminated when their positions no longer existed.[5]

The points at which plaintiff claims to have suffered Title VII race discrimination are a bit unclear from his complaint [Doc. 1] and responsive brief [Doc. 21-1]; however, as plaintiff's brief points out, at his deposition he testified that the first time he suffered discrimination on the basis of race was when he was "forced to work in the produce area[,]" after the TMA Cashier position was eliminated. [Doc. 21-1, pp. 2-3]. Plaintiff claims that Caucasian employees were given job assignments within the store that plaintiff was not given. Specifically, plaintiff points to Teresa Loveday, who he claims worked in the Clothing department, Wayne Rippy, who worked as a Door Greeter after shoulder surgery, and Teresa Lanessa, who worked in the Clothes Folding section during the day shit after an injury. Plaintiff testified at his deposition that each of these employees are Caucasian and that they were allowed to come back to work immediately after injuries and work in these accommodated positions, while plaintiff was required to take time off of work and use his personal time, sick pay, and vacation pay to take time off.

---

[5] Defendant additionally claims that to the extent that plaintiff claims his temporary assignment to the Meat Demo Associate position was race discrimination, that claim is without merit because Caucasian Meat Demo Associates have also sold chicken and ribs. To the extent that plaintiff makes a claim that his assignment to the Meat Demo Associate position constituted race discrimination, the Court finds that his assignment to that position was not an adverse employment action for Title VII purposes and would dismiss such a claim.

14

Plaintiff also testified that he was singled out by Pat Bratton, when she yelled at him that he was "worthless and a bad representative of Sam's Club" and that she did not yell at Caucasian workers who were also there. Plaintiff testified that co-workers Dorothy Cain, Pat Prince, and Sandra McCroskey witnessed Ms. Bratton singling him out. He also claims that Ms. Bratton required him to work on his lunch break and that David Franklin, a manager at the time, witnessed this. Plaintiff additionally believes that he was discriminated against on the basis of his race when his pay went from a PPG 3 to a PPG 2, from $15.45 per hour to $15.25 per hour, when he was moved into the Maintenance Associate position on December 6, 2009.

Defendant replies that summary judgment is appropriate here because plaintiff has made vague allegations of non-protected class employees being allowed to do things that plaintiff was not and being treated better and less harshly than plaintiff. Defendant argues that without providing any substantive evidence, facts, or analysis as to how the alleged non-protected employees were similarly situated to plaintiff in all relevant aspects, such assertions by plaintiff are conclusory allegations that are insufficient to satisfy the fourth prong of the *prima facie McDonnell-Douglas* case.

As plaintiff was not replaced, the Court will focus on the similarly-situated inquiry. A plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly situated." Rather, a plaintiff need only show that they are similar in all relevant aspects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Clayton*

15

*v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). To be deemed "similarly situated," the Sixth Circuit has stated that the non-protected individuals with whom the plaintiff seeks to compare his treatment must have: (1) "dealt with the same supervisor;" (2) "been subject to the same standards;" and (3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 583 (6th Cir. 1992). The Sixth Circuit has held that under Title VII, "[d]ifferences in job titles, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated[.]" *Leadbetter v. Gilley*, 385 F.3d 683, 691-92 (6th Cir. 2004) (finding a plaintiff not similarly situated to a non-protected employee with "superior experience").

As stated above, as to the elimination of plaintiff's TMA Cashier position, he was not replaced by anyone, and his was not the only position eliminated around that time. Moreover, two of the other employees whose positions were eliminated at the same time had their employment with defendant separated after their positions were eliminated. Two additional employees whose positions were eliminated around the same time, who accepted other positions at Club #6572, received greater pay reductions based on lower PPGs than plaintiff did. Plaintiff signed and accepted the Job Offer indicating his lower PPG, and there is no evidence that he objected to that lower PPG at any time. In fact, he admitted at his deposition that the PPG levels are applied equally to each of defendant's employees and correspond with the positions in which employees work.

16

As to plaintiff's allegation that he has been treated differently than Caucasian employees Teresa Loveday, Teresa Lanessa, and Wayne Rippy, plaintiff has presented no evidence to establish that those employees were similarly situated to him in any way. He testified that the three each were allowed to work in different positions than he was after suffering injuries, but he admitted that he was unsure whether the others were allowed to obtain the other positions because those positions were open at the point at which they were injured, and he did not dispute that the positions he was offered were the only open ones at the point he returned from injury leave. While plaintiff argues that he was required to use sick leave and vacation time when he was injured while others were not, plaintiff has not produced any evidence to show that those employees had more or less serious injuries than him or that they were in any other way similarly situated. Plaintiff has likewise produced no evidence and made no allegations regarding the type employment history the others had with defendant, their experience levels, or the supervisors with which they dealt. *See Mitchell*, 964 F.2d at 582-83.

As to plaintiff's argument that Ms. Bratton treated him more harshly than others and called him lazy, as well as required him to work on his lunch break, plaintiff has not identified any employees that he believes were treated differently than him or that were in any way comparable but not treated harshly. Plaintiff must identify some other individuals with whom he seeks to compare his treatment by the same supervisor, and he has failed to do so. *See, e.g., Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) ("Conclusory assertions, supported only by plaintiff's own opinions, cannot

17

withstand a motion for summary judgment."); *Johnson v. Sinai Hosp. of Greater Detroit*, No. 4:10-CV-12321-DT, 2012 WL 219506, at *8 (E.D. Mich. Jan. 6, 2012) (noting that the plaintiff had pointed to no specific evidence of similar performance problems in regard to the employees she claimed were similarly situated to her and that the plaintiff's own subjective beliefs were insufficient to support a finding of discrimination). Moreover, as discussed below, defendant alleges that any interaction plaintiff would have had with Ms. Bratton would be from the time during which plaintiff worked as a People Greeter between 2004 and 2007 and would thus be time-barred at this point.

Accordingly, because plaintiff has not identified any similarly-situated individuals, he has not established the fourth prong and cannot make out a *prima facie* case for race discrimination under Title VII, and the Court will **GRANT** summary judgment as to this claim. Because the Court finds that the plaintiff has not met the fourth prong of his *prima facie* case, it need not address the other prongs or whether defendant presented a legitimate reason for any alleged adverse employment action suffered by plaintiff.

## IV.    Disability Discrimination Under the ADA

The ADA provides that an employer "'shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(a)). To make out a *prima facie* case of employment discrimination utilizing indirect evidence under the ADA a plaintiff must

18

generally show: 1) he is disabled; 2) he was otherwise qualified for the position, with or without reasonable accommodation; 3) he suffered an adverse employment decision; and 4) the circumstances give rise to an inference of unlawful discrimination, or a nexus exists between the adverse action suffered and the plaintiff's disability. *See Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802; *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177-86 (6th Cir. 1996)), *abrogated on other grounds by*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*). A plaintiff must establish that he would not have suffered the adverse employment action but for his disability. *Frengler v. Gen. Motors*, 482 F. App'x 975, 976 (6th Cir. 2012) (citations omitted). As stated above, under the burden-shifting framework of *McDonnell Douglas*, after a plaintiff makes out a *prima facie* case, the burden is shifted to the defendant to articulate a non-discriminatory reason for the employment action. 411 U.S. at 802-04. If the defendant does so, the burden returns to the plaintiff to prove that the stated reason is pretextual. *Id.*

The ADA Amendments Act of 2008 took effect on January 1, 2009. Pub. L. No. 110-325, § 8. Because the adverse employment actions alleged by plaintiff took place after that date, the amendments apply to this case. *See Milholland v. Sumner Co. Bd. of Educ.*, 569 F.3d 562 (2009).

### A.    Disability

Under the ADA, a person is disabled if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102 (2006) (amended 2009).

Under the ADA, a person is disabled if he:

(A)    [has] a physical or mental impairment that substantially limits one or more of [his] major life activities . . . ;

(B)    [has] a record of such impairment; or

(C)    [is] regarded as having such an impairment . . . .

42 U.S.C. § 12102(1).  "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, *lifting*, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A) (emphasis added).

An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).  Under the amended ADA, the term "disability" is meant to be construed in favor of broad coverage.  42 U.S.C. § 12102(4)(A).  As lifting is a major life activity under the amended ADA, the Court must look to the definition of "substantial limitation."  *See Jenkins v. Nat'l Bd. of Med. Exam'rs*, No. 08-5371, 2009 WL 331638, *2-3 (6th Cir. Feb. 11, 2009) (dealing with reading as a major life activity under the

20

amended ADA).[6]    The EEOC has determined that under the amended ADA, "substantially limits" is "not meant to be a demanding standard."    29 C.F.R. § 1630.2(j)(1)(i) and (iii).  "An impairment need not prevent, or significantly restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(ii).

Defendant argues that plaintiff cannot establish the first element of a *prima facie* case of ADA discrimination because he is not disabled.  In making this argument, defendant cites to several cases wherein it was found that an employee with only a general lifting restriction imposed by a physician, without more, was insufficient for a finding of a disability within the definitions of the ADA.  *See, e.g., Scott v. G & J Pepsi-Cola Bottlers, Inc.*, 391 F. App'x 475 (6th Cir. 2010); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Williams v. Avnet, Inc.*, 910 F. Supp. 1124, 1132 (E.D.N.C. 1995).  A review of the cases cited by defendant, and of others finding that a weight lifting restriction is insufficient for a finding of disability, shows that the

---

[6] In the ADA Amendments Act, Congress indicated its intention for the ADA to give broad protection to individuals with disabilities, and in repudiating the Supreme Court's decision in *Toyota Motor Manufacturing, Kentucky, Inc., v. Williams*, 534 U.S. 184 (2002), rejected its holding "that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives[.]'"  Pub. L. No. 110-325, § 2(b)(4). In enacting the ADA Amendments Act, "Congress overturned the definition of 'substantially limits' put forward in *Toyota* and directed the courts to interpret the term in a more inclusive manner."  *Jenkins*, 2009 WL 331638, at *3.

21

cases having so found applied the *Toyota* rules, prior to the ADA Amendments Act. *See, e.g., Scott*, 391 F. App'x at 479 n.3 ("Mr. Scott's termination occurred before the 2008 amendments became effective[,]" and "we consider his disability discrimination claim under the law as it existed before the amendments." (citation omitted)); *see also Rico v. Xcel Energy, Inc.*, --- F. Supp. 2d. ---, 2012 WL 4466631, *4-5 (D.N.M. Sept. 25, 2012) (finding that the express language of the ADA Amendments Act "calls into question the continued precedential value of pre-amendment cases" and declining to look to pre-ADA Amendments Act Tenth Circuit cases finding that lifting restrictions did not substantially limit major life activities as "valid guidance" in a post-ADA Amendments Act lifting restriction case).

Prior to the broadened definition of disability under the ADA Amendments Act, "[f]ederal case law support[ed] that a maximum weight restriction [wa]s not a disability as defined by the ADA." *Law v. City of Scottsville*, 221 F.3d 1335, *4 (6th Cir. June 15, 2000) (table) (reviewing cases from this and other circuits finding that weight restrictions on lifting did not constitute a disability for ADA purposes). However, "[f]ew courts have had the occasion to consider the effects of the ADAAA[,] and [t]hose that have, apply it broadly to encompass disabilities that previously might have been excluded." *Harty v. City of Sanford*, No. 11-cv-1041, 2012 WL 3243282, *5 (M.D. Fla. Aug. 8, 2012).

Accordingly, prior to the adoption of the ADA Amendments Act, plaintiff's lifting restriction, combined with his restriction against repetitive lifting, would likely not have sufficed to established plaintiff as disabled for disability discrimination purposes. Given

22

the expansion of the definition of disability, however, several district courts have recently found weight lifting restrictions to be adequate to constitute a disability under the ADA, or at least sufficient to avoid summary judgment on the issue. *See, e.g., Lohf v. Great Plains Mfg., Inc.*, No. 10-1177-RDR, 2012 WL 2568170, *4-6 (D. Kan. July 2, 2012) (recognizing that it was a close question but finding under the less restrictive standards of the amended ADA that plaintiff had offered sufficient evidence to raise a genuine issue of fact as to disability where he had a twenty-five to thirty pound lifting restriction and a need to alternate sitting and standing); *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 621-22 (E.D. Pa. 2012) (finding a three pound lifting restriction sufficient to establish a genuine issue of fact as to disability and to survive summary judgment); *Williams v. United Parcel Servs., Inc.*, 2:10-1546-RMG, 2012 WL 601867, *3 (D.S.C. Feb. 23, 2012) (adopting a report and recommendation finding a disputed issue of fact as to whether plaintiff with twenty pound lifting restriction was disabled for ADA discrimination purposes); *Farina v. Branford Bd. of Educ.*, No. 09-CV-49, 2010 WL 3829160, *11 (D.Conn. Sept. 23, 2010) (noting that in light of the lowered disability threshold of the ADA Amendments Act, and the inclusion of lifting as a major life activity, "it is possible that even a relatively minor lifting restriction could qualify as a disability within the statute"), *aff'd*, 456 F. App'x 13 (2d Cir. 2011).

Accordingly, in light of the broadened standard for determining disability under the ADA Amendments Act, along with the recent district court decisions analyzing lifting restrictions in light of the Act, the Court finds plaintiff's weight restriction, as evidenced

through doctor's notes in the record, sufficient to create a question of fact as to disability. Therefore, the Court will address additional aspects of plaintiff's ADA discrimination claim to determine if it will survive defendant's motion for summary judgment.

### B.    Adverse Employment Action

Defendant argues that plaintiff cannot show that he suffered an adverse employment action because of his alleged disability.[7]  As possibly related to disability discrimination, plaintiff apparently argues that the adverse employment actions he suffered were: "(1) Being given an ultimatum that he could either work as a cashier associate, a produce associate (both of which were outside his restrictions) or quit;" "(2) Being given another ultimatum that he would be fired if he did not work in an area outside of his restrictions;" "(3) Being given another ultimatum that if he did not work in the produce position, he would be fired;" and "(5) Having his pay reduced when he went from the position of meat demo associate to maintenance" [Doc. 21-1].

---

[7] Defendant argues that plaintiff cannot show he was otherwise qualified for the Produce Associate position, with or without a reasonable accommodation.  As defendant points out, plaintiff signed the Job Offer for the Produce Associate position acknowledging with the certification: "I have the ability to perform the essential functions of this position either with or without a reasonable accommodation" [Doc. 17-5, p. 3].  The Produce Sales Associate Job Description, signed by plaintiff and initialed at the box "I have the ability to perform the essential functions of this position either with or without a reasonable accommodation," includes under Physical Activities that the employee "moves, lifts, carries, and places merchandise and supplies weighting less than or equal to 50 pounds without assistance" [Doc. 17-10, p. 7]. Plaintiff had a weight lifting restriction much lower than that required for the position at the time.  Accordingly, as defendant argues, plaintiff was not otherwise qualified for the Produce Associate position, because the lifting requirement was necessary to perform the essential functions of the position and he could not perform them with or without a reasonable accommodation.

24

Defendant asserts that the only positions available at the time the TMA Cashier positions were eliminated in the Market through a reduction of workforce were the lower-paying positions of the Produce Associate and the Cashier position.[8] Plaintiff's Job Offer indicated that he was moving from a PPG 3 to a PPG 2 when he accepted the Produce Associate position and the PPG levels apply the same to all associates, with the level of responsibility determining the pay grade.

Defendant also argues that even if plaintiff could establish that he was treated adversely as compared to a non-disabled person, his claim still must fail because he has not shown that any adverse action was taken "because of" his impairment. "The . . . ADA bar[s] discrimination 'because of' an employee's . . . disability, meaning that [it] prohibit[s] discrimination that is a '"but-for" cause of the employer's adverse decision.'" *Lewis*, 681 F.3d at 321 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Assuming *arguendo* that plaintiff established a *prima facie* case, defendant has articulated a non-discriminatory reason for offering plaintiff the decision to take Produce Associate position, take the Cashier position, or seek employment elsewhere. Defendant has shown that the Market Managers made the business decision during a reduction in workforce to eliminate the TMA Cashier position and that plaintiff was offered the only open positions at Club # 6572 at the time. Defendant has also shown that the reduction in

---

[8] Upon review of plaintiff's complaint and responsive brief, it does not appear to the Court that plaintiff argues that the elimination of the TMA Cashier position itself was an adverse employment action or constituted race or disability discrimination.

25

pay plaintiff incurred was because the Produce Associate position, which he accepted, was assigned a different PPG level than the TMA Cashier position. Others whose positions were eliminated during the reductions in January and February 2009 either had their employment terminated or were forced to take a similar PPG cut with their new positions. Accordingly, defendant has asserted a legitimate non-discriminatory reason for plaintiff being offered the Produce Associate position and for his reduction in hourly wage when he accepted that position. Nothing in the record indicates that defendant's Market Managers' decision to eliminate the TMA Cashier position had anything to do with plaintiff's alleged disability. Likewise, no evidence indicates that but for plaintiff's weight lifting restriction, he would not have been offered the Produce Associate or Cashier positions. Defendant could have separated plaintiff's employment, as it did for two others at the time his position was eliminated, but it instead allowed him to continue at the Club and offered him the only positions available at the time.

To the extent that plaintiff claims the reduction in pay when he moved to his Maintenance Associate position in December 2009 was an adverse employment action suffered because of his disability, the Court again finds that plaintiff signed the Job Offer indicating his pay level would go from PPG 3 to PPG 2 when he moved to that position and that plaintiff has not shown that this pay level change was for any reason other than the new position, obtained when he no longer worked in a T.A.D. position, being assigned a lower PPG.

26

Accordingly, because plaintiff has not shown that any adverse employment action he may have suffered was because of his alleged disability and has also not shown that defendant's non-discriminatory reason for any such adverse action was merely pretext for its true discriminatory intent, the Court finds that no genuine issue of fact exists to preclude summary judgment on plaintiff's ADA discrimination claim.

### C.    Failure to Accommodate

In his complaint, plaintiff asserts: "Plaintiff requested on several different occasions to be moved to a position that would accommodate his disability but was denied, although other job opportunities were given to his Caucasian counterparts, as well as, individuals who were not suffering from a disability" [Doc. 1 ¶ 21].[9]  In his response, plaintiff claims that defendant failed to act in good faith by "forcing Plaintiff to work outside of his restrictions and not even caring about how he became under restrictions nor how the injury occurred" [Doc. 21-1, p. 28].  Plaintiff argues that "Sam's Club never accommodated the Plaintiff" and "it is crystal clear that the Defendant perceived him as

_____

[9] It is unclear the points at which plaintiff alleges that he requested to be moved to different positions, as the record indicates only that he requested to be moved in 2007, when he submitted a Request for Reasonable Accommodation form and went through the process of negotiating such an accommodation.  The record does not support a finding that plaintiff made any requests in 2009, and he does not allege that he did so.  Accordingly, to the extent that plaintiff asserts that he made a request for a reasonable accommodation such that he would satisfy that element of a claim for failure to accommodate in 2007 or before, a failure to accommodate based on that time frame would be time-barred.   An individual alleging discrimination under the ADA must file an administrative charge of discrimination with the EEOC within 300 days of the alleged unlawful discriminatory practice occurring.  42 U.S.C. § 2000e-5(e)(1) (applicable to ADA claims under 42 U.S.C. § 12117(a)); *see Kovacevick v. Kent State Univ.*, 224 F.3d 806, 831 (6th Cir. 2000).  Plaintiff filed his charge with the EEOC on May 4, 2009 [Doc. 1].

disabled" [*Id.*, p. 29]. Plaintiff also claims that Mr. Johnson told him "to 'do it anyway' . . . when the Plaintiff informed him that said work was outside his restriction" [Doc. 21-1, p. 24].

"In order to establish a *prima facie* case for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011) (citation omitted). "The employee . . . bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations." *Id.* at 983 (citation omitted).

At his deposition, plaintiff admitted that he did not request for a reasonable accommodation in 2009. To the contrary, he signed the Job Offer for the Produce Associate position and indicated that he was able to perform all job functions, which included lifting up to fifty pounds. When plaintiff requested a reasonable accommodation in 2007, defendant's ADA department went through the process of negotiating that accommodation with plaintiff, exchanging many letters, and he was aware of how the process worked. While plaintiff's complaint alleges that he "requested on several different occasions to be moved to a position that would accommodate his disability," nothing in the record, including the deposition of plaintiff, supports such an

28

allegation.  The evidence shows that on February 28, 2009, the day plaintiff came to work and showed doctors' notes to his managers, indicating that he had weight restriction of no repetitive lifting and no lifting over thirty pounds, plaintiff was told he could not work in the Produce department and no longer did so.  After plaintiff returned to work, he was placed in T.A.D. positions, the essential duties of which he could perform with his lifting restrictions recommended by his doctors.

Viewing the facts in the light most favorable to plaintiff, when considering the process defendant went through with plaintiff when he requested a reasonable accommodation in 2007, and the fact that as soon as his managers saw that he had a restriction beyond what was required to work in the Produce Associate position they removed him from the position, it appears that had plaintiff requested a reasonable accommodation in 2009, defendant may have been receptive to the informal process required.  Accordingly, plaintiff cannot establish a *prima facie* case for failure to accommodate, and the Court will **GRANT** summary judgment on that claim.

V.    **Hostile Work Environment**

A.    **Racially Hostile Work Environment Under Title VII**

The *McDonnell Douglas* burden-shifting analysis also applies to claims of hostile work environments.  *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).  "To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently

severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citation omitted).

"The conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). "[W]hether an environment is 'hostile' or 'abusive' can only be determined by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). A court should consider harassment "by all perpetrators combined," instead of "divid[ing] and categoriz[ing] the reported incidents." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (dealing with a claim of a sexually hostile work environment); *see Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("[T]he same principles that govern sexual harassment also govern claims of racial harassment."). "[O]nly harassment *based on the plaintiff's race* may be considered." *Williams*, 643 F.3d at 511 (citing *Bowman v. Shawnee State Univ.*, 220 F.3d at 464) (emphasis in original).

"A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* at 511 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (approving these methods in the analogous context of sexual harassment)).

30

Harassment need not be explicitly based on race to be illegally race-based if the plaintiff shows that but for his race he would not have been subjected to the harassment. *Clay*, 501 F.3d at 706.

Plaintiff alleges that he was subject to hostile work environment based on his race when he was "forced to sell chicken and ribs" [Doc. 21-1, p. 24]. Plaintiff claims that while working as a Meat Demo Associate he was told by several of defendant's employees and supervisors "just sell them ribs," "you need to work with the ribs and chicken," and "let me see you sweat" [Docs. 1, 21-1]. Plaintiff also claims that he was referred to as "the chicken man" and "rib king" by defendant's member customers and by "management" [Doc. 21-1, p. 24]. Plaintiff alleges that he was "forced" by defendant to wear a red apron that had the words "Rotisserie Rib King" on the front, while other Caucasian employees wore plain black aprons.

Defendant argues that plaintiff cannot establish the third and fourth elements of his *prima facie* case. First, defendant asserts that plaintiff admits that these comments were made while plaintiff's "actual job was to sell ribs and chicken as a Meat Demo Associate for an approximate six-month period" [Doc. 16, p. 16 (emphasis omitted)]. Defendant points out that the only exception is plaintiff's allegation that a man named "Michael" from the "home office" called him the "chicken man" once after he left his position as a Meat Demo Associate. As to plaintiff's allegation that Mr. Johnson told him he "want[ed] to see [him] sweat," defendant denies that the comment was made, and further argues that even if it was made, the comment does not evidence racial animus.

31

Defendant contends when taken in totality, the comments do not create a severe and pervasive hostile work environment as contemplated by Title VII. Defendant points out that the only evidence produced by plaintiff of Mr. Johnson telling him to "do the job anyway," despite his lifting restrictions, and that he wanted to "see [plaintiff] sweat," are plaintiff's own self-serving statements to that effect. Defendant also argues that plaintiff has failed to show that any of these comments were made because he is an African American.

Defendant submits that the "alleged comments are not objectively hostile and abusive" and suggests that cases with far more egregious circumstances than the one at issue have been dismissed at the summary judgment stage [Doc. 16, p. 22 (citing *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714 (6th Cir. 2012) (upholding district court grant of summary judgment on plaintiff's claim of hostile work environment where plaintiff experienced vulgar graffiti, overtly racist comments, and racially motivated pranks over a period of twenty-five years)].

Plaintiff also claims that he was singled out by Ms. Bratton, who is no longer employed by defendant, when she allegedly yelled at him in front of his Caucasian co-workers and told him he was "worthless and a bad representative of Sam's Club" [Doc. 21-1, p. 25]. Plaintiff alleges that Ms. Bratton did not make any similar comments to others. He asserts that the instance was witnessed by Dorothy Cain, Pat Prince, and Sandra McCroskey. Defendant replies to this claim that in asserting it, plaintiff is attempting to create a dispute of fact where none exists. Defendant asserts that it is

32

undisputed that plaintiff was a People Greeter from 2004 to 2007. Defendant represents that Ms. Bratton was defendant's Operational Manager during the time when plaintiff was a People Greeter. Accordingly, defendant asserts that any "vague claims regarding conduct and/or comments by Pat Bratton sometime between 2004 and 2007 are time-barred and must be disregarded" [Doc. 23, p. 6]. Moreover, defendant argues, plaintiff has provided no evidence to show that any comments made by Ms. Bratton had to do with plaintiff's race or alleged disability.[10]

In looking at the allegations related to plaintiff's position as the Meat Demo Associate, the Court first finds that a reasonable jury could not find that the comments were made based on plaintiff's race. Plaintiff's admits that his primary duty while working as a Meat Demo Associate was selling ribs and chicken. Plaintiff does not

---

[10] Defendant argues that plaintiff unreasonably failed to take advantage of defendant's policies and procedures for complaining about the allegedly hostile work environment. Defendant also asserts that plaintiff never complained to anyone at Sam's about the alleged discrimination or harassment. Plaintiff did not call the 1-800 Ethics Hotline, and he never complained using the open door policy on which he was trained. Defendant asserts that "[a]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer of the allegedly hostile work environment" [Doc. 23, p. 6 (quotation marks and citations omitted)]. In plaintiff's affidavit, attached to his response in opposition to defendant's motion for summary judgment, he attempts to clarify that when he answered in the negative when asked whether he had ever complained about any discrimination or harassment to anyone at Sam's Club, he had thought that counsel for defendant was asking if he had complained to anyone in the corporate office, rather than to the managers at his Club [Doc. 22-1]. Plaintiff asserts that he "most assuredly complained to my managers **inside** my club such as Byron Johnson, Pat Bratten, Brian Heid about me being discriminated and harassed at work" [*Id.* at 2 (emphasis in original)]. "[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). Moreover, in light of the Court's finding below that plaintiff has not established a *prima facie* case of a hostile work environment, the Court need not address defendant's knowledge of plaintiff's perceived harassment.

33

allege that anyone from Sam's made comments to plaintiff that could be considered overtly race-specific or derogatory.  To the extent that plaintiff argues that his wearing the red apron stating "Rotisserie Rib King" on the front, given to him by an African-American supervisor, while Caucasian employees wore black aprons, defendant argues that Caucasian employees have worn the red apron since plaintiff moved out of the position.  While plaintiff's affidavit indicates that he "ha[s] no knowledge of that[,]" he has presented no evidence to disprove that fact [Doc. 22-1 (emphasis omitted)]. Additionally, it appears based on the record that the apron was given to the Club at which plaintiff worked as appreciation for their large number of rib sales, and defendant asserts that plaintiff was given the apron as a successful rib and chicken seller.  As to plaintiff's allegation that Mr. Johnson told him he "want[ed] to see [him] sweat," and that such comment as based on his race, no context was given to this comment and no evidence before the Court leads to the conclusion that a reasonable jury could find that any such comment was made based on plaintiff's race.

Moreover, even if a reasonable jury could find that the comments alleged by plaintiff were made based on his race, the Court finds that the totality of the alleged harassment was not "sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Considering the relevant factors of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,"

34

the Court finds that the alleged comments were not physically threatening or humiliating, were not severe, were not objectively offensive, and did not unreasonably interfere with plaintiff's work performance. *See Id.* at 23.

Last, assuming that any comparative-evidence claims related to Ms. Bratton's treatment of plaintiff are not time-barred, plaintiff's allegation that he was treated adverse to others based on his race is unpersuasive. He alleges that Ms. Bratton yelled at him and told him that he was a bad representative of the company, but did not yell at others. Plaintiff has not alleged that any of the comments made by Ms. Bratton included any racist language and has produced no direct evidence that any of the alleged adverse treatment was based on race. While plaintiff argues that Caucasian employees were not yelled at on their "idle time," he does not present any evidence that any of the other employees were doing the same activities as he was when Ms. Bratton yelled at him. Accordingly, no reasonable jury could find that the alleged adverse treatment was based on plaintiff's race. *See Williams*, 643 F.3d at 512 (finding that no reasonable jury could find that plaintiff's allegations of adverse treatment was based on race where plaintiff presented insufficient evidence to compare her treatment with that of her white co-workers and supervisors used no racist language).

Accordingly, for the reasons explained above, the Court will **GRANT** summary judgment in favor of the defendant as to plaintiff's Title VII hostile work environment claim, and the claim will be dismissed.

**B.     Hostile Work Environment Under the ADA**

Defendant asserts that to the extent plaintiff makes a claim for hostile work environment under the ADA, the "claim is bereft of substantive evidence and must be dismissed" [Doc. 16, p. 23].  While plaintiff asserts in passing in his memorandum in support of his response to defendant's motion for summary judgment [Doc. 21-1] that he is making advancing a claim for hostile work environment under the ADA, upon review, it does not appear that he makes any such argument to that effect or points to any facts to support a claim of a hostile work environment based upon his alleged disability. Accordingly, to the extent that plaintiff asserts an ADA hostile work environment claim, summary judgment is **GRANTED** as to that claim, and it is dismissed at this time.

**VI.     Retaliation**

**A.     Retaliation Under the ADA**

To make out a *prima facie* case of ADA retaliation, a plaintiff must prove (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection between the protected activity and the adverse employment action.  *Penny*, 128 F.3d at 417.  If the plaintiff establishes the *prima facie* case, the burden will shift to the employer to show a legitimate, non-discriminatory basis for the action.  *Id.*  The plaintiff employee must then show that the proffered reason was a pretext for discrimination.  *Id.*  "[T]o establish a retaliation claim the plaintiff need not prove that he had a disability under the ADA[;] [r]ather the protected activity is the

showing of a good-faith request for reasonable accommodations." *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n.8 (6th Cir. 2011) (citation omitted).

Defendant argues that plaintiff's ADA retaliation claim fails as a matter of law because plaintiff has not provided substantive facts to support his claim. Citing plaintiff's deposition testimony, defendant asserts that plaintiff admitted to never having requested a reasonable accommodation for his alleged disability in 2009. Defendant argues that plaintiff's requests for a reasonable accommodation in 2004 and 2007 occurred too remote in time to establish a causal connection between any protected activity and any 2009 adverse employment action [Doc. 16, p. 27]. *See Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004) (affirming district court's grant of summary judgment on First Amendment retaliation claim, finding eight months to be a long period for employer to have retaliated against employee); *Holley v. Giles Cnty., Tenn.*, 165 F. App'x 447, 452 (6th Cir. 2006) ("Hayward's resignation occurred eleven months after the personal injury suits were filed. Such a long time lag between the speech and the adverse employment action is a strong indication that the action was not retaliatory.").

Plaintiff claims that he made a request for a reasonable accommodation [Doc. 22-5] and that such request was a "protected activity," of which defendant was aware, for purposes of ADA retaliation. As to the adverse employment action he suffered, plaintiff submits that a reasonable jury could determine that he suffered an adverse action when he was forced to choose between the Produce Associate position and quitting his position

37

with defendant. Without presenting evidence in support, plaintiff additionally claims that he was required to use vacation and leave time when he was injured and that this was an adverse action. Plaintiff argues that a reasonable jury could conclude that the adverse employment actions he suffered were caused by his insistence that he be given an accommodation to allow him to continue working.[11]

Defendant replies that plaintiff has not provided any facts to support a finding of a causal connection between plaintiff's request for a reasonable accommodation in 2007 and any adverse action alleged taken by defendant in 2009. The Court agrees. In light of the Market group decision to eliminate the TMA Cashier position and the fact that plaintiff was offered the open positions at the Club at the time, as discussed more fully above, a reasonable jury could not find that defendant offering plaintiff the Produce Associate position, a Cashier position, or to separate his employment in February 2009, was in any way linked to plaintiff's undisputed protected activity of his 2007 request for a reasonable accommodation. The Court finds that plaintiff has failed "to establish the requisite causal connection between the alleged incidents of retaliation and the protected activity." *Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998) (citing

---

[11] Plaintiff also claims that he was "given a retaliatory write-up for allegedly using unsafe work practices when he sustained his on-the-job injury" [Doc. 21-1, p. 25]. Plaintiff in no way expands upon this argument or alleges facts to support it. In fact, plaintiff's responsive memorandum characterizes this "retaliatory write-up" as harassment, rather than alleging it in the context of retaliation. Plaintiff did not receive a pay reduction or any other disciplinary action following the unsafe work practices write-up. "[A]n employee's work violations constitute a legitimate, nondiscriminatory reason for adverse employment decisions." *Walborn v. Erie Cnty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998). Plaintiff does not claim that he did not use unsafe work practices or that he was not responsible for the conduct described in the write-up. The record includes no evidence that the write-up was retaliation.

38

*Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (requiring plaintiff to produce evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action").

Accordingly, because plaintiff has failed to establish a *prima facie* case, the Court hereby **GRANTS** summary judgment as to plaintiff's ADA retaliation claim.

### B.    Retaliation Under Title VII

Upon review of plaintiff's complaint [Doc. 1] and his memorandum in support of his response to defendant's motion for summary judgment [Doc. 21-1], it does not appear that he is advancing a claim for retaliation under Title VII, as he alleges no facts which could support such a claim. Accordingly, to the extent that plaintiff attempts to assert a claim for retaliation under Title VII, summary judgment is **GRANTED** as to that claim, and the claim is dismissed at this time.

## VII.    Working Off the Clock

Defendant also argues that to the extent that plaintiff sufficiently alleges a claim for working off the clock in his complaint, such claim fails as a matter of law. In support, defendant points out that plaintiff testified at his deposition that he only worked off the clock while in his position as a People Greeter. As defendant claims that plaintiff only worked in the People Greeter position prior to October 2007, defendant argues that even taking plaintiff's allegation as true, his claim fails because that would mean that his last time working off the clock was approximately two years before he filed this Charge with the EEOC, making the claims time-barred under Title VII and the ADA. While

plaintiff's response notes some deposition testimony related to working off the clock, [Doc. 21-1, p. 19], and claims that his being forced to work off the clock without payment is a factor supporting his claim of hostile work environment, [Doc. 21-1, p. 25], he does not respond to defendant's argument that any separate claim of working off the clock is time-barred.

The Court agrees with defendant that any claim sought to be brought under Title VII or the ADA for working off the clock would be time-barred here, as having occurred more than 300 days prior to the filing of the EEOC Charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Alexander v. Local 496*, 177 F.3d 394, 407 (6th Cir. 1999). Additionally, as defendant points out, plaintiff's Complaint does not reference the Fair Labor Standards Act ("FLSA") and even if it had, a claim under the FLSA would likewise be time-barred. Accordingly, the Court **GRANTS** summary judgment as to plaintiff's claim for working off the clock, and it is dismissed at this time.

## VIII. Conclusion

For the reasons stated herein, the Court will **GRANT** Defendant Sam's East, Inc.'s Motion for Summary Judgment [Doc. 15] in all respects.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE